**POWER ENGINEERING COMPANY, Redoubt Ltd. and Richard J. Lilienthal, Plaintiffs,**

v.

**ROYAL INSURANCE COMPANY OF AMERICA, Defendant.**

No. Civ.A. 98–B–1547.

United States District Court, D. Colorado.

July 21, 2000.

John J. Zodrow, John F. McBride, Zodrow, et al., P.C., Denver, CO, for plaintiff.

Lorraine M. Armenti, Patrick J. Casey, McElroy, Deutsch & Mulvaney, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Plaintiffs and Defendant cross-move for summary judgment pursuant to Rule 56. The motions are adequately briefed and oral argument would not aid their resolution. For the reasons set forth below, I grant Defendant's motion, and deny Plaintiffs' motion. Jurisdiction exists under 28 U.S.C. § 1332, and it is undisputed that Colorado law governs this case.

### I.

The following facts are undisputed unless otherwise noted. Plaintiffs, Power Engineering Company (PEC) and Redoubt Ltd., are Colorado corporations with their principle place of business at 2525 South Delaware Street in Denver. Plaintiff, Richard J. Lilienthal, is an officer of and shareholder in Plaintiffs PEC and Redoubt Ltd. Defendant is an Illinois corporation authorized to do business in Colorado.

PEC has operated an industrial crankshaft reconditioning business in Denver since 1976. The reconditioning process involves cleaning, grinding, electroplating, and polishing the crankshafts. Crankshafts are electroplated by placing them in tanks containing chromic acid solution.

From December 1, 1985 to November 30, 1986, Defendant provided insurance coverage to PEC under policy PYAG62406 (Policy 1). Policy 1 contained a limited pollution exclusion in the "Comprehensive General Liability" coverage that did not apply to "sudden or accidental" "discharge[s], dispersal[s], release[s] or escape[s]" of, *inter alia,* "irritants, contaminants or pollutants." *Defendant's Motion for Summary Judgment,* Ex. I, at 38. An endorsement to Policy 1's "Comprehensive General Liability" coverage modified the pollution exclusion as follows:

It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids alkalies, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following:

(1) to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

> (a) at or from premises owned, rented or occupied by the named insured;

> (b) at or from any site or location used by or for the named insured or others for the handling, storage, disposal, processing or treatment of waste;

> (c) which at any time are transported, handled, stored, treated, disposed of, or processed as waste by or for the named insured or any person or organization for whom the named insured is legally responsible; or

(d) at or from any site or location on which the named insured or any contractors or subcontractors working directly or indirectly on behalf or the named insured are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2) to any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

*Id.,* Ex. I, at 40. PEC and Defendant renewed Policy 1 for the term December 1, 1986 to November 30, 1987 (Renewed Policy 1). *See id.,* Ex. J. Renewed Policy 1 contained an endorsement to the "Business Auto and Truckers Polic[y]" which excluded from coverage "bodily injury or property damage" resulting from the spill of pollutants before, during, or after their transportation. *Defendant's Motion for Summary Judgment,* Ex. J, at 104–05.

PEC and Defendant entered into insurance policy PSP009549 with a term of December 1, 1987 to November 30, 1988 (Policy 2). Although the absolute pollution exclusion had been contained in an endorsement to the "Comprehensive General Liability" coverage of Policy 1 and Renewed Policy 1, Plaintiffs and Defendants placed it in the body of the "Commercial General Liability" coverage of Policy 2. The exclusion provides:

I. Coverage A. Bodily Injury and Property Damage Liability

II. Exclusions. This insurance does not apply to:

(f)(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a) At or from premises you own, rent or occupy;

(b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or

(d) At or from any site or location in which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2) Any loss, cost or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

*Id.,* Ex. K, at 194–95. In addition, the following "Important Notice to Policyholders" was attached to Policy 2:

**Pollution Liability:** The new policies do not cover this liability if the pollutants escape from your premises or a waste disposal or treatment facility. (The exclusion in the previous policy did not apply to "sudden and accidental" emissions of pollutants; the new policy does not have this exception). Certain pollution exposures away from your premises—including many that arise out of your products or work—are covered regardless of whether the emission was

"sudden" or not. See exclusion f. under Coverage A. for details.

*Id.,* Ex. K, at 161. In an endorsement to the "Commercial Property" coverage under Policy 2, PEC and Defendant agreed as follows:

**Pollutant Clean Up and Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the release, discharge or dispersal of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period....

*Id.,* Ex. K, at 155. PEC and Defendant renewed Policy 2, including the provisions quoted above, for the term December 1, 1988 to November 30, 1989 (Renewed Policy 2). *See id.,* Ex. L, at 289–90, 281, 250, respectively.

Defendant provided insurance coverage to PEC under policy PSV004260 (Policy 3) from December 1, 1989 to November 30, 1990. Policy 3 contained the same pollution exclusion in the "Commercial General Liability" coverage as Policy 2. *See id.,* Ex. M, at 855–56. In addition, the body of the "Commercial Property" coverage contained the "Pollutant Removal and Clean Up" provision previously located in the endorsement to Policy 2. *See id.,* Ex. M, at 838. PEC and Defendant renewed the policy for the term December 1, 1990 to November 30, 1991 (Renewed Policy 3), and changed the second paragraph of the absolute pollution exclusion section as follows:

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way respond-ing to, or assessing the effects of pollutants.

*Id.,* Ex. N, at 745.

From 1976 to present, at least five distinct incidents occurred in which chromic acid solution spilled or discharged at or from PEC's facility. In 1979, chromic acid solution spilled from one of the electroplating tanks, spread across the floor in the southwest area of the plant, and accumulated in pits designed for collection purposes. Some of the solution entered the dock area and stained the exterior of the dock doors at the south end of PEC's building. In 1983, a frozen pipe broke and spilled as much as 3,000 gallons of water that entered an electroplating tank and displaced chromic acid solution. The solution spread throughout the southwest portion of PEC's building. In 1989, an electroplating tank was overfilled with water resulting in the displacement of chromic acid onto the floors and into the pits containing the electroplating tanks. Sometime during the 1970s, "a large volume" of chromic acid solution overflowed from the tanks and into the scrubber duct work resulting in its discharge into the air to the west of PEC's building. The airborne chromic acid solution settled onto PEC's property, as well as adjoining properties.

In addition to these distinct events, PEC claims that "at times during PEC's operations, small quantities" of chromic acid solution spilled while removing crankshafts and other engine components from the electroplating tanks. *Plaintiffs' Motion for Summary Judgment* at 4. According to Plaintiffs, installation of the electroplating tanks involved removing sections of a preexisting concrete floor, and then placing the tanks in the resulting "pit." No concrete or other type of barrier existed between the bottom of the tanks and the earth. In addition, because these tanks did not fit perfectly within the pits, gaps existed between the sides of the tanks and the sides of the pits. Plaintiffs claim that the "small quantities" of spilled chromic acid solution "occasionally" entered the

gaps between the tanks and the sides of the pits and drained down to the soil below. *Id.* All of these incidents led to chromium contamination of soil below the plating tanks and along the south end of the west wall of PEC's building. This contamination resulted, in turn, in a "groundwater plume" originating at the southwest corner of PEC's facility.

In 1986, PEC notified the Colorado Department of Public Health and the Environment (CDPHE) that it generated four different types of hazardous waste, but neither listed chromium as a constituent part of the waste generated, nor indicated that it treated, stored, or disposed of the wastes at its South Delaware Street facility. In 1992, the CDPHE learned of a discharge into the Platte River of hexavalent chromium. Soon thereafter, the CDPHE began a series of compliance evaluation inspections.

As a result of these inspections, the CDPHE discovered that PEC had been treating, storing, and disposing of hazardous wastes without either the proper state or federal permits, or attaining "interim status" under 42 U.S.C. § 6925(e)(1) which permits continued operations during the pendency of an application for a federal permit. In addition, the CDPHE learned that chromium emanating from PEC's place of business had contaminated groundwater both under, and under areas outside of, its place of business. On March 10, 1993, PEC notified the CDPHE that in addition to the wastes identified in its 1986 notification, it also generated five other hazardous wastes. On June 11, 1993 and September 28, 1993, the CDPHE issued notices of violation to PEC indicating that it had been improperly treating storing, and disposing of hazardous wastes.

By letter dated October 15, 1993, PEC notified Defendant regarding the chromium contamination of soil and groundwater, and submitted the CDPHE's September 28, 1993 notice of violation as a claim. *See Plaintiffs' Motion for Summary Judgment,* Ex. F. On November 11, 1993, Defendant responded that it would investigate the claim "under a complete reservation of [their] rights in every respect." *Plaintiffs' Motion for Summary Judgment,* Ex. G, at 1. On December 8, 1993, Defendant informed PEC that it would deny coverage based on the absolute pollution exclusion clause included in every policy issued by Defendant to PEC.

In July 1994, the CDPHE issued an Initial Compliance Order, but stayed its execution so as to discuss the order with Defendants. These discussions took place from September 1994 to June 1996. In June 1996, the CDPHE issued a Final Administrative Compliance Order which requires Defendant PEC to: (1) immediately comply with applicable hazardous waste laws; (2) refrain from the treatment, storage, and disposal of hazardous wastes without obtaining Interim Status or the proper permit(s); (3) properly manage wastes; (4) submit for review and approval plans for weekly inspections of hazardous waste containers; (5) submit a complete 1990/1991 Biennial Report reflecting all hazardous wastes generated, treated, stored, and disposed of during those years; (6) submit an updated 1992/1993 Biennial Report including waste codes applicable to off-site disposal; (7) implement the "Removal Plan for Chrome Contaminated Stockpiled Soils"; (8) submit for review and approval a soil characterization and groundwater sampling work plan; (9) submit for review and approval a corrective measure study plan evaluating remedial alternatives to prevent, mitigate, and remediate the releases from the facility; and (10) within thirty days of CDPHE approval of the corrective measure study, implement the remedial alternative.

PEC did not appeal the Final Administrative Compliance Order, but also failed to implement its requirements. Consequently, the CDPHE issued an Administrative Penalty Order assessing civil penalties of $1.13 million. When PEC failed to comply with the Administrative Penalty Order, the CDPHE brought suit in Colorado state court on August 1, 1997 seeking to

force PEC to comply with both the Final Administrative Compliance Order, and the Administrative Penalty Order. *See Colorado Department of Public Health and Environment v. Power Engineering Co.,* No. 98–CV–4850 (District Court, City and County of Denver, filed August 1, 1997).

Although the CDPHE had the authority to demand financial assurances, the Final Administrative Compliance Order did not require them. Because of this, the U.S. Government filed suit against Plaintiffs on August 1, 1997 in the United States District Court for the District of Colorado. *See United States v. Power Engineering Co.,* No. 97–B–1654 (United States District Court for the District of Colorado, filed August 1, 1997). PEC notified Defendant of the CDPHE and U.S. Government lawsuits by letter dated September 15, 1998 and asked Defendant to defend and indemnify it. By letter dated November 13, 1998, Defendant refused to do so. Plaintiffs filed this action seeking a declaratory judgment that Defendant must "defend and indemnify [them] in [the] actions brought by the [CDPHE] and the United States Environmental Protection Agency ("EPA") which, in part, seek relief directing that PEC remediate contaminated soils and groundwater at, around, under and flowing away from PEC's place of business." *Pretrial Order* at 2. Plaintiffs also seek compensatory damages for "defense costs and remediation costs incurred through the date of trial for remediation of such contamination."*Id.*

## II.

### A.

Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where, as here, the parties file cross motions for summary judgment, I assume that no evidence need be considered other than that filed by the parties. *James Bar-*

*low Family Ltd. Partnership v. David M. Munson, Inc.,* 132 F.3d 1316, 1319 (10th Cir.1997). Nevertheless, summary judgment is inappropriate if genuine issues of material fact exist. *Id.* If no reasonable juror could find for the non-moving party based on the evidence present in the motion and response, then summary judgment is proper and a trial is unnecessary. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B.

Under Colorado law, an insurance carrier's duty to defend under a liability insurance policy arises whenever a complaint alleges any facts that arguably fall within the coverage of the policy. *See Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083, 1089 (Colo.1991). " 'The actual liability of the insured to the claimant is not the criterion which places upon the insurance company the obligation to defend.' Rather, the obligation to defend arises from allegations in the complaint, which if sustained, would impose a liability covered by the policy." *Id.* (quoting *Douglass v. Hartford Ins. Co.,* 602 F.2d 934, 937 (10th Cir.1979)). An insurer's "duty to defend is broader than the duty to indemnify ... [and] in some instances, insurers will be found to have a duty to defend even though ultimately it may be determined that they have no duty to indemnify." *Compass Ins. Co. v. City of Littleton,* 984 P.2d 606, 613 (Colo.1999) (quotation omitted).

Colorado "has set a high standard for an insurance company seeking to avoid its duty to defend" under a policy's exclusions under which

> an insurer must establish that the exemption claimed applies in the particular case, and that the exclusions are not subject to any other reasonable interpretation. The insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusions

in the insurance policy. An insurer is not excused from its duty to defend unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured. *Id.* at 614 (quoting *Hecla,* 811 P.2d at 1090). Further, under Colorado law, if the underlying complaint asserts more than one claim, a duty to defend against all claims asserted arises if any one of them is arguably a risk covered by the pertinent policy. *See Fire Ins. Exch. v. Bentley,* 953 P.2d 1297, 1300 (Colo.App.1998).

## III.

### A.

Defendant argues that because chromium qualifies as a "pollutant" under Policy 1, Renewed Policy 1, Policy 2, Renewed Policy 2, Policy 3, and Renewed Policy 3, and because the complaints in both the CDPHE and U.S. Government lawsuits allege chromium contamination of soil and groundwater originating from PEC's facility, "the allegations in the complaint[s] are solely and entirely within the [pollution] exclusion[ ] [clauses] in the insurance polic[ies]." *Compass Ins. Co.,* 984 P.2d at 614. As support, Defendant cites my decision in *Blackhawk–Central City Sanitation v. American Guarantee and Liability Insurance Company,* 856 F.Supp. 584 (D.Colo.1994), which the Tenth Circuit recently upheld in pertinent part. *See Blackhawk–Central City Sanitation v. American Guarantee and Liability Insurance Company,* 214 F.3d 1183, 1188–91 (10th Cir.). In *Blackhawk–Central City Sanitation,* I held that an absolute pollution exclusion in one commercial liability policy at issue in that case excluded coverage for all pollution damage. *Blackhawk–Central City Sanitation,* 856 F.Supp. at 591. *See Blackhawk–Central City Sanitation,* 214 F.3d at 1188–91 (upholding that portion of my decision). *But see id.,* 214 F.3d at 1190–96 (overturning my decision that discharges of pollutants did not qualify as "accidents" under an exception to a limited pollution exclusion clause in a different policy). Defendant argues that because there is no substantive difference

between the absolute pollution exclusion clauses in *Blackhawk* and this case, it is entitled to summary judgment.

Plaintiffs do not contest that chromium qualifies as a "pollutant" under all of the policies, or that when considered in isolation the terms of the absolute pollution exclusion clauses in the policies in question apply to the allegations in the underlying complaints. Instead, they argue that all of the absolute pollution exclusions are inconsistent with provisions found elsewhere in those policies, and that such ambiguities must be construed against Defendant and in favor of coverage. They also argue that the absolute pollution exclusion provisions in Policy 2 and Renewed Policy 2 cannot be enforced because of the reasonable expectations doctrine and C.R.S. § 10–4–110.5. In support of this latter argument, Plaintiffs assert that Defendant did not give them notice that the absolute pollution exclusion clauses in the Policy 2, and the Renewed Policy 3 would reduce their coverage. Plaintiffs contend in response to Defendant's summary judgment motion that genuine issues of material fact remain regarding the question whether Defendant has a duty to defend it in the CDPHE and U.S. Government lawsuits. In their motion for summary judgment, however, Plaintiffs assert that there are no such issues and, thus, they are entitled to summary judgment.

Given Plaintiffs' implicit concessions, I conclude that, when considered in isolation, the absolute pollution exclusion provisions of the policies apply to the allegations in the complaints filed by the CDPHE and the U.S. Government. I will thus address each of Plaintiffs' arguments in their response to Defendant's motion for summary judgment that Defendant is nevertheless required to defend them in the actions brought by the CDPHE and the U.S. Government.

### 1.

#### a.

Plaintiffs first argue that the limited pollution exclusion in the body of Policy 1

consists of two components corresponding to the exclusion's two clauses: a pollution exclusion (first clause), and a limitation on the application of that exclusion (second clause). Further, Plaintiffs claim that the pollution exclusion endorsement merely "modif[ied]" the pollution exclusion component, and not the limitation component. Because the limitation portion of the original pollution exclusion provision remained, the endorsement's absolute exclusion renders the contract ambiguous and thereby triggers "the general rule that ambiguities are construed against the insurer and for coverage." *Plaintiffs' Response* at 8.

Defendant counters that there is no ambiguity because the pollution exclusion endorsement clearly replaced the limited pollution exclusion in the body of the policy. Defendant claims that I considered and rejected a similar argument in *Blackhawk. See Defendant's Reply* at 3 (citing *Blackhawk*, 856 F.Supp. at 589). In a supplemental brief, Defendant argues that the Tenth Circuit upheld my decision with respect to that question. *See Defendant's Supplemental Brief* (citing *Blackhawk*, 214 F.3d at 1188–91). I agree.

■ In conducting coverage analysis, the intent of the parties as expressed in the plain language of the contract controls. *See State Farm Mutual Automobile Insurance Co. v. Stein*, 940 P.2d 384, 387 (Colo.1997). I must construe the terms of the insurance contract as they would be understood by a person of ordinary intelligence, *State Farm Mutual Automobile Insurance Co. v. Nissen*, 851 P.2d 165, 167 (Colo.1993), and avoid strained constructions of the language used. *Allstate Insurance Co. v. Starke*, 797 P.2d 14, 18 (Colo.1990). When provisions within the policy are ambiguous, I must construe the insurance policy in favor of coverage, and against limitations. *Bohrer v. Church Mutual Insurance Co.*, 965 P.2d 1258 (Colo. 1998). A policy provision is ambiguous if it is reasonably susceptible on its face to more than one interpretation. *See Union Ins. Co. v. Houtz*, 883 P.2d 1057, 1061 (Colo.1994). In determining whether

there is an ambiguity in a policy provision, I must evaluate the policy as a whole and construe the language in harmony with the plain and generally accepted meaning of the words employed, unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended. *See Parrish Chiropractic Centers, P.C. v. Progressive Cas. Ins. Co.*, 874 P.2d 1049, 1055 (Colo.1994). "[M]ere disagreement between the parties regarding the meaning of a policy term does not create an ambiguity." *Stein*, 940 P.2d at 387.

■ In addition, "when a conflict in an insurance contract arises between provisions contained in the body of the policy and provisions contained in an endorsement to that policy," "[t]he general rule provides that ... the endorsement provisions prevail." *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 241 (Colo.1992). Simon recognized an exception to that general rule, however, holding that conflicting provisions should be construed against the insurer in cases where the endorsement contains no separate signatures, and there is no other evidence or allegation that the endorsement had been separately negotiated. *See id.* at 241–42. The *Simon* exception does not apply, however, when the endorsement clearly and unambiguously replaces the provision in the body of the insurance contract with which it allegedly conflicts. *See Blackhawk*, 214 F.3d at 1190–91.

■ Here, the pollution exclusion endorsement states in relevant part: "It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following." *Defendant's Motion for Summary Judgment*, Ex. I, at 40. Although this language mirrors *part* of the pollution exclusion in the body of Policy 1, *compare id. with id.* at 38 ("This insurance does not apply: ... (f) to bodily injury or property damage

arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants *into or upon the land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental* ") (emphasis added), no person of ordinary intelligence would construe the endorsement as replacing only part of that exclusion. *See Nissen,* 851 P.2d at 167 (using "person of ordinary intelligence" standard in construing insurance contract). Indeed, taking Plaintiffs' argument to its logical conclusion, because the endorsement language mirrors just *part* of the first clause of the pollution exclusion, in addition to the limitation "component" of the pollution exclusion the following language from the pollution exclusion "component" would also remain in force: "into or upon land, the atmosphere or any water course or body of water." *Defendant's Motion for Summary Judgment,* Ex. I, at 38. Such an interpretation is at best "strained." *Starke,* 797 P.2d at 18 ("strained constructions [of insurance policies] should be avoided"). Consequently, the pollution exclusion endorsement clearly and unambiguously replaces the whole pollution exclusion in the body of Policy 1. *See Blackhawk,* 214 F.3d at 1190–91 (upholding my decision that an absolute pollution exclusion in an endorsement replaced the limited pollution exclusion in the body, including the exception for "sudden accidents involving pollutants" included in the second sentence of the limited exclusion, even though the endorsement stated only that it "replace[d] the Pollution exclusion" and did not mention the exception). The *Simon* exception does not apply to this case. *See id.*

Nor does the endorsement render the policy ambiguous. The plain and generally accepted meaning of the language "It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following" is reasonably susceptible to only one interpretation: the pollution exclusion endorsement replaces the entire pollution exclusion in the body of the insurance contract. *See Houtz,* 883 P.2d at 1061 ("A policy provision is ambiguous if it is susceptible to more than one reasonable interpretation."). Plaintiffs' view that the endorsement renders the policy ambiguous is nothing more than "mere disagreement between the parties regarding the meaning of a policy term." *Stein,* 940 P.2d at 387. The terms of the absolute pollution exclusion clause in Policy 1, and hence Renewed Policy 1, at issue here are not ambiguous. No genuine issue of material fact remains on that question.

b.

Plaintiffs also contend that the "Notice to Policyholders" in Policy 2, and Renewed Policy 2, renders Policy 1 and Renewed Policy 1 ambiguous because it shows that Defendant was confused about the coverage in Policy 1. *See Plaintiffs' Response* at 10–11. Specifically, Plaintiffs claim the statement in the "Notice" that although the exclusion in Policy 1 "did not apply to sudden and accidental emission of pollutants; the new exclusion [in Policy 2] does not have this exception" "demonstrate[s]" "[t]he conclusion that the conflict between the Limited Pollution Exclusion and the Pollution Exclusion Endorsement [in Policy 1] created an ambiguity." *Id.* at 10. Plaintiffs further argue that the "Notice to Policyholders" conflicts with the absolute pollution exclusion contained in Policy 2 and Renewed Policy 2 insofar as it states that "certain pollution exposures away from your premises—including many that arise out of your products or work—are covered regardless of whether the emission was 'sudden' or not." *Defendant's Motion for Summary Judgment,* Ex. K, at 161. Plaintiffs thus argue that the ambiguity must be construed against Defendant and in favor of coverage. Again, I disagree.

■ Under Colorado law, "[i]t is well-settled that when a document is unambiguous, it cannot be varied by extrinsic evidence." *Farmers High Line Canal and Reservoir Company v. City of Golden*, 975 P.2d 189, 198 n. 14 (Colo.1999). As I concluded above, the absolute exclusion clause in Policy 1 is not ambiguous. Accordingly, I cannot consider Policy 2 in interpreting Policy 1.

■ Even considering Policy 2, Policy 1 and Renewed Policy 1 remain unambiguous. The "Notice to Policyholders" unambiguously states in boldface type:

> **This pamphlet is not your policy. It merely describes some of the major features of the new Commercial General Liability policy. READ YOUR POLICY CAREFULLY to determine rights, duties, and what is and what is not covered. Only the provisions of your policy determine the scope of your insurance protection.**

*Defendant's Motion for Summary Judgment*, Ex. K, at 161 (emphases in original). If the "Notice to Policyholders" did not amend or otherwise change the extent of coverage in Policy 2, it could not do so with respect to Policy 1. Moreover, the "Notice to Policyholders" appears to be a standard form issued to all holders of a commercial general liability policy. The "Notice to Policyholders" cannot, therefore, be deemed an authoritative interpretation of Policy 1.

In addition, the notice does not conflict with the absolute pollution exclusions in Policy 2, and Renewed Policy 2 because the notice states unequivocally that the policies control. No genuine issues of material fact remain regarding whether the "Notice to Policyholders" renders the absolute pollution exclusions of Policy 1, Renewed Policy 1, Policy 2, and Renewed Policy 2 ambiguous. Summary judgment in favor of Defendant is thus appropriate on that question.

c.

■ Plaintiffs argue that the endorsement to the "Business Auto and Truckers Polic[y]" contained in Renewed Policy 1 excluding from coverage "bodily injury or property damage" resulting from the spill of pollutants before, during, or after their transportation, *Defendant's Motion for Summary Judgment*, Ex. J, at 104–05, "further confuses the nature and scope of the absolute exclusion" in that policy. *Plaintiffs' Response* at 14. Similarly, Plaintiffs claim that the exclusion from the "Contractors [sic] Equipment," and "Small Business Computer/Machine" components of Policy 3, and Renewed Policy 3 for "a) [e]xtract[ing] 'pollutants' from land or water; or b) [r]emov[ing], restor[ing] or replac[ing] polluted land or water" somehow renders ambiguous the absolute pollution exclusion clause in the "Commercial General Liability" coverage of these policies. I disagree.

As clearly stated, the endorsement cited by Plaintiffs modifies only the "Business Auto and Truckers Policies." *See Defendant's Motion for Summary Judgment*, Ex. J, at 103. That endorsement, as well as the "Contractors [sic] Equipment Coverage," and the "Small Business Computer/Machine Coverage" of Policy 3 and Renewed Policy 3, are distinct from the coverage provided by the "Commercial General Liability" coverage provided by those policies. *See* Ex. N, at 777 ("Contractors [sic] Equipment Coverage" applies to "your contractors' equipment and similar property of others that is in your care, custody or control"); Ex. N, at 784 ("Small Business Computer/Machine Coverage" extends to "Electronic equipment, business computers, business machines, word processors and electronic information systems, including component parts owned by you and similar property of others in your care, custody and control"). Language in one "Part" or "Coverage" cannot affect the coverage provided by another, unless it explicitly addresses coverage provided elsewhere within the policy. Because the cited endorsement, and the "Contractors [sic] Equipment," and "Small Business Computer/Machine" coverages do not indicate as much, they have no effect

whatsoever on the "general liability" parts of Renewed Policy 1, and Policy 3 and Renewed Policy 3, respectively. *See, e.g., id.,* Ex. 1, at 3 (noting that coverage for "General Liability" and "Automobile Insurance," including that for "Business Auto," and "Truckers," are distinct coverages within the overall policy). Consequently, the endorsement to the "Business Auto and Truckers Polic[y]," "Contractors [sic] Equipment Coverage," and "Small Business Computer/Machine Coverage" cannot "confuse[ ] the nature and scope of the absolute [pollution] exclusion" in the "Commercial General Liability" coverage of these policies. *See Plaintiffs' Response* at 26.

Based on this record, no reasonable juror could conclude that the endorsement to the "Business Auto and Truckers Policies," the "Contractors [sic] Equipment Coverage," or the "Small Business Computer/Machine Coverage" rendered ambiguous the pollution exclusion endorsement to Renewed Policy 1, or the pollution exclusion clauses of the "Commercial General Liability Coverage" coverage of Policy 3 and Renewed Policy 3. Summary judgment in favor of Defendant is thus appropriate on this question.

d.

▮ Plaintiffs next argue that the "Commercial Property" coverage of Policies 2 and 3, and Renewed Policies 2 and 3 conflicts with the absolute pollution exclusions in those policies. Specifically, Plaintiffs claim that the conditional coverage for "Pollutant Clean Up and Removal" provided by the endorsement to the "Commercial Property" coverage of these four policies, *see Defendant's Motion for Summary Judgment,* Ex. K, at 155; Ex. L, at 281; Ex. M, at 844; Ex. N, at 731 (conditional coverage for "Pollutant Clean Up and Removal"), renders ambiguous the absolute pollution exclusion in the "Commercial Liability" coverages of those policies. Plaintiffs conclude that "[t]he inconsistent and conflicting terms that at once provide, exclude, and limit coverage for pollution discharges are clearly ambiguous and contra-

dictory, and must be construed to preclude enforcement of the absolute pollution exclusion to deny coverage to PEC." *Plaintiffs' Response* at 22. I am unpersuaded.

The "Commercial Property Part," and the "Commercial General Liability Part" of Policies 2 and 3 are distinct coverages provided by those policies. *See, e.g., id.,* Ex. K, at 131; Ex. L, at 266 (the "Commercial Property Part" covers "direct physical loss of or damages to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss,"); Ex. K, at 194; Ex. L, at 289 (the "Commercial General Liability Part" provides coverage for "those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies."). As I stated, language in one "Part" or "Coverage" cannot affect the coverage provided by another, unless it explicitly addresses coverage provided elsewhere within the policy. No reasonable juror could conclude that the "Commercial Property" coverage of Policies 2 and 3, and Renewed Policies 2 and 3, in any way affects the absolute pollution exclusion of the "Commercial General Liability" coverage provided by those policies.

▮ To the extent that Plaintiffs are somehow trying to invoke coverage, and thereby trigger a duty to defend, under the "Commercial Property Parts" of those policies, Plaintiffs fail to cite any section of the "Commercial Property Parts" that imposes such a duty. *But see id.,* Ex. I, at 38; Ex. K, at 194; Ex. L, at 289; Ex. M, at 855; Ex. N, at 744 ("Commercial General Liability Parts" impose such a duty). Plaintiffs also have not directed me to, nor am I otherwise aware of, any case that has found such a duty imposed by a commercial property policy or any other type of first-party property policy. *See Farmers Group, Inc. v. Williams,* 805 P.2d 419, 421 (Colo.1991) ("When the benefit derives from the insurer's duty to defend the insured against third-party actions, that re-

lationship is characterized as a "third-party claim." A "first-party claim," on the other hand, results when the insured makes a claim against his insurer for benefits accruing directly from the insurance contract."); *Browder v. U.S. Fidelity and Guaranty Co.*, 893 P.2d 132, 134 n. 3 (" 'Liability insurance is sometimes called 'third party' insurance because it does not recompense the insured for his own loss.... Instead, liability insurance protects the insured against damages which he may be liable to pay to other persons by virtue of his own actions.' ") (quoting Rowland H. Long, The Law of Liability Insurance § 1.01 (1994)). *See also A & E Supply Company, Inc. v. Nationwide Mutual Fire Insurance Co.*, 798 F.2d 669, 676 n. 8 (4th Cir.1986) ("An insurer's first-party insurance obligation is its duty to compensate the insured for direct losses within the policy coverage. An insurer's third-party insurance obligation is its duty to defend the insured against claims by another, injured party and to indemnify the insured for losses sustained through such claims."); *Haley v. Continental Casualty Co.*, 749 F.Supp. 560, 571 (D.Vt.1990) ("A first-party insurance obligation is the duty of an insurer to compensate the insured for direct losses within the policy coverage. A third-party insurance obligation is the insurer's duty to defend the insured and settle claims made by a third party against the insured."). Under these circumstances, I will not recognize such a duty under a first-party policy. *See Williams*, 805 P.2d at 421 ("in the first-party situation the insured did not cede any right to represent his interests to the insurer"); *M.L. Foss, Inc. v. Liberty Mut. Ins. Co.*, 885 P.2d 284, 285 (Colo.App.1994) (concluding that no duty to defend arises under "a first-party policy [when] the underlying action ... [is] a third-party claim."). *See also Anderson Development Co. v. Travelers Indemnity Co.*, 49 F.3d 1128, 1134 (6th Cir.1995) ("clean up costs constitute[ ] an existing liability to the government [covered by third-party insurance] rather than a decrease in the value of the 'owned' property [covered by first-party insur-

ance]"). Consequently, no genuine issue of material fact remains regarding whether the "Commercial Property" coverage of Policies 2 and 3, and Renewed Policies 2 and 3, imposes a duty to defend the third party actions brought by the CDPHE and U.S. Government. Summary judgment in favor of Defendant is appropriate on that question.

### 2.

#### a.

Plaintiffs next claim that Defendant defeated their reasonable expectations and violated C.R.S. § 10–4–110.5 by not providing advance written notice that Policy 2 would reduce the coverage previously offered under Policy 1. *See* C.R.S. § 10–4–110.5 ("No insurer shall ... decrease the coverage benefits on renewal of a policy of insurance that provides coverages on commercial exposures such as general comprehensive liability ... unless the insurer mails by first-class mail to the named insured, at the last address shown in the insurer's records, at least forty-five days in advance a notice, accompanied by the reasons therefor, stating the renewal terms and the amount of premium due."). Specifically, Plaintiffs contend that the absolute pollution exclusion and "Pollutant Clean Up and Removal" endorsement in Policy 2 decreased the scope of coverage provided by Policy 1. I disagree.

■ Under the reasonable expectations doctrine, exclusionary language that conflicts with the objectively reasonable expectations of the insured is not enforceable, even if a " 'painstaking study of the policy provisions would have negated those expectations.' " *State Farm Mutual Auto. Insurance Co. v. Nissen*, 851 P.2d 165, 168 (1993) (citation omitted). In addition, "an insurer who fails to notify the insured of limitations regarding coverage may be precluded from relying on the existence of such limitations to avoid liability.... This is especially true with respect to renewal policies." *Tepe v. Rocky Mountain Hospi-*

*tal and Medical Services*, 893 P.2d 1323, 1328 (Colo.App.1994) (citations omitted). Under such circumstances, the " 'long-standing general principle [applies] . . . that an insurance company is bound by a greater coverage in an earlier policy when a renewal policy is issued but the insured is not notified of the specific reduction in coverage.' " *Id.* (citations omitted). C.R.S. § 10–4–110.5 codified this common law rule in the context of renewal policies. *See* C.R.S. § 10–4–110.5 ("No insurer shall . . . decrease the coverage benefits on renewal of a policy of insurance that provides coverages on commercial exposures such as general comprehensive liability . . . unless the insurer mails by first-class mail to the named insured, at the last address shown in the insurer's records, at least forty-five days in advance a notice, accompanied by the reasons therefor, stating the renewal terms and the amount of premium due.").

Here, because the endorsement to Policy 1 unambiguously contained an absolute pollution exclusion, the pollution exclusion in Policy 2 did not reduce the coverage. In addition, the "Pollutant Clean Up and Removal" endorsement did not affect the scope of Plaintiff's commercial general liability coverage. Instead, the "endorsement modifies insurance provided under the following: COMMERCIAL PROPERTY COVERAGE PART." *Defendant's Motion for Summary Judgment*, Ex. K, at 155. Objectively reasonable insureds recognize that "Commercial Property" coverage is distinct from "Commercial Liability" coverage. *See id.*, Ex. K, at 115, 122, 192 (describing "Commercial Property" coverage and "Commercial Liability" coverage as distinct components of the insurance policy). Accordingly, the "Pollutant Clean Up and Removal" endorsement to the "Commercial Property" coverage did not require Defendant to notify Plaintiffs pursuant to the reasonable expectations doctrine or C.R.S. § 10–4–110.5 regarding changes in their "Commercial Liability" coverage. No reasonable juror could conclude that the pollution exclusion in Policy 2 constituted a reduction in coverage rela-

tive to Policy 1's "commercial liability coverage," requiring Defendant to notify Plaintiffs pursuant to either C.R.S. § 10–4–110.5, or the reasonable expectations doctrine. Accordingly, summary judgment in favor of Defendant on this question is appropriate.

#### b.

■ Plaintiffs finally argue that the changes made to the second paragraph of Policy 3's pollution exclusion clause in Renewed Policy 3 required advance written notice which Defendant failed to provide. *Compare id.*, Ex. M, at 856("(2) Any loss, cost or expense arising out of *any governmental direction or request* that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.") (emphasis added) *with* Ex. N, at 745("(2) Any loss, cost or expense arising out of any: (a) *Request, demand or order* that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or (b) *Claim or suit by or on behalf of a governmental authority* for damages because of testing for, monitoring cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.") (emphasis added). Specifically, Plaintiffs contend that the renewal exclusion expanded the scope of the exclusion because "a reasonable insured could understand the term ["any governmental direction or request"] to exclude legal proceedings or formal government enforcement actions brought pursuant to statute or a regulatory action such as a 'claim or suit' for damages caused by pollutants." *Plaintiffs' Response* at 24. Plaintiffs thus argue that in Renewed Policy 3, "[r]equest, demand or order" replaced "any governmental direction or request" from the exclusion in Policy 3, and "[c]laim or suit by or on behalf of a governmental authority" expanded that exclusion. Such expansion, according to Plaintiffs, required notice

pursuant to C.R.S. § 10–4–110.5. Yet again, I disagree.

No reasonable person would believe that "any governmental direction or request" does not apply to formal legal proceedings. Indeed, in the context of our federal environmental laws, a court order merely enforces a proper "governmental direction or request" that a business entity or person comply with those laws. In addition, because the federal judiciary is a branch of the U.S. Government, *see, e.g.,* U.S.Constitution, Art. III; *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 2247, 144 L.Ed.2d 636 (1999) ("limited and enumerated powers [are] granted to the Legislative, Executive, and Judicial Branches of the National Government"), any order of a federal court is a "governmental direction" to undertake some action.

Finally, Plaintiffs' interpretation of the exclusion language "any governmental direction or request" would effectively eviscerate the exclusion. Under Plaintiffs' interpretation, Defendant intended to exclude from coverage pollution remediation undertaken pursuant to informal requests by the Government, but intended to cover such remediation after PEC refused to comply with the informal request and the resulting court action compelled them to do so. If such an interpretation were accurate, every policyholder would merely refuse any request and force the Government to take them to court in order to trigger coverage. The exclusion would then exclude nothing. I will not interpret the exclusion so as to effectively remove it from the insurance contract. *See Chacon v. American Family Mutual Insurance Co.,* 788 P.2d 748, 750 (Colo. 1990) ("An insurance policy is a contract which should be interpreted consistently with the well settled principles of contractual interpretation."); *Brown v. Brown,* 161 Colo. 67, 419 P.2d 444, 445 (1966) ("[I]t is a cardinal rule that an agreement ... must be construed as a whole and effect given, if possible, to its every provision."); *Lawrence St. Partners v. Lawrence St. Venturers,* 786 P.2d 508, 510 (Colo.App.1989) ("Contracts should be construed to give effect to the intent of the parties .... and effect must be given to every provision if possible."); Restatement (Second) of Contracts § 203(a) (1979) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"). Consequently, the changes made to the second paragraph of Policy 3's pollution exclusion clause in Renewed Policy 3 did not reduce the coverage provided in Policy 3. No genuine issue of material fact remains on that question. Summary judgment in favor of Defendant is again appropriate.

### B.

In their motion for summary judgment, Plaintiffs offer no further argument regarding the absolute pollution exclusion clauses. Instead, they merely incorporate their arguments from their response to Defendant's motion for summary judgment. They also argue that the owned property exclusion is inapplicable, Defendant's anticipated late notice defense is invalid, and there were "occurrence[s]," as defined by the "Commercial General Liability" coverage of the policies, that triggered Defendant's duty to defend. Because Plaintiffs have offered no persuasive reason why I should disregard my provisional conclusion that "the allegations in the complaints [filed by the CDPHE and U.S. Government] are solely and entirely within the exclusions in the insurance policy," *Compass,* 984 P.2d at 614, no reasonable juror could conclude that the allegations in the complaints arguably fall within the coverage of the policies. *Hecla,* 811 P.2d at 1089. Summary judgment for Plaintiffs is thus inappropriate.

### IV.

For the foregoing reasons, Defendant is entitled to summary judgment on the question of whether it has a duty to defend Plaintiffs in the suits brought by the

CDPHE and U.S. Government. Because it does not have a duty to defend, Defendant also does not have a duty to indemnify Plaintiffs for any liability resulting from those suits, nor is it liable for compensatory damages for "defense costs and remediation costs incurred through the date of trial [as a result of the government-imposed] remediation." *Pretrial Order* at 2. *See Constitution Assocs. v. New Hampshire Ins. Co.*, 930 P.2d 556, 563 (Colo. 1996) ("[w]here there is no duty to defend, it follows that there can be no duty to indemnify.").

Accordingly, IT IS ORDERED THAT

(1) Plaintiffs' motion for summary judgment is DENIED;

(2) Defendant's motion for summary judgment is GRANTED;

(3) Plaintiffs' Complaint is DISMISSED; and

(4) Defendant IS AWARDED ITS COSTS.