Marilyn SIMON, James Simon, and Rob Coppola, d/b/a Designer Spas & Hot Tubs, Petitioners,

v.

SHELTER GENERAL INSURANCE COMPANY, a Missouri corporation, Respondent.

No. 91SC608.

Supreme Court of Colorado, En Banc.

Dec. 14, 1992.

Rehearing Denied Jan. 11, 1993.

Pryor, Carney and Johnson, P.C., Mark P. Martens and W. Randolph Barnhart, Englewood, for petitioners Marilyn Simon and James Simon.

Renner & Rodman, Raymond J. Lego, Denver, for petitioner Rob Coppola.

Foede and Lichtenstein, David Lichtenstein, Westminster, for respondent.

Chief Justice ROVIRA delivered the Opinion of the Court.

We granted certiorari to review the decision of the Colorado Court of Appeals in *Shelter General Insurance Co. v. Coppola*, 824 P.2d 58 (Colo.App.1991), which held that provisions of an insurance policy contained in an endorsement prevail over inconsistent provisions contained in the body of the policy, even though the endorsement and the body of the policy were issued simultaneously, and are fully enforceable against the insured. We reverse.

## I

The relevant facts are undisputed. In November 1987, Marilyn Simon was seriously burned when she fell into a hot tub that had been reconditioned by Rob Coppola, d/b/a Designer Spas & Hot Tubs (Coppola). Coppola furnished an equipment pack which contained a defective thermostat as part of its reconditioning of the hot tub. Due to the failure of the thermostat, the water in the hot tub rose to approximately 160 degrees. The thermostat was manufactured by Eaton Corporation.

■ Simon and her husband later brought suit against Coppola asserting claims for negligent reconditioning of the hot tub and negligent failure to instruct on the proper use of the hot tub. Shelter General Insurance Company (Shelter) then filed a declaratory judgment action against Coppola claiming that its comprehensive general liability policy did not provide coverage for the claims asserted by the Simons. The trial court agreed, finding that both the products hazard and completed operations exclusions unambiguously applied to the stipulated facts and provided no coverage. The court of appeals affirmed.[1]

Under the general grant of coverage contained in the body of the policy issued to Coppola, Shelter agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of A. bodily injury or B. property damage to which this insurance applies...." This general grant of coverage is limited by a series of exclusions which narrow the scope of coverage under the policy. In the body of the policy, one such exclusion provides:

This insurance does not apply:

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; *but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner....*

(Emphasis added and omitted.) (Hereinafter "exclusion (a).") The general grant of coverage is also limited by exclusions contained in endorsements to the policy. One such endorsement exclusion states:

It is agreed that such insurance as is afforded by the Bodily Injury Liability Coverage and the Property Damage Liability Coverage does not apply to bodily

1. The issues raised in this appeal are not moot. Shelter provided a defense to Coppola under a reservation of rights. Consequently, this case requires us to determine whether or not Shelter actually has such rights (and we need not be concerned with the question whether these rights will indeed be invoked by Shelter). The determination of whether these rights exist will turn on whether Shelter's policy excludes cover- age or is fully enforceable. If the Shelter policy provides coverage to Coppola, then clearly Shelter would have no right to recover the cost of defending Coppola against the Simons' claims. Consequently, the decision of this court will have a "practical legal effect upon the existing controversy." *American Drug Store, Inc. v. City & County of Denver*, 831 P.2d 465, 469 (Colo. 1992).

injury or property damage included within the Completed Operations Hazard or the Products Hazard.

(Emphasis omitted.) (Hereinafter "endorsement" or "endorsement exclusions.")

The definitions section contained in the body of the policy defines "completed operations" and "products hazard" as follows:

"completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the named insured under the contract have been completed,

(2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed. (emphasis omitted) (Hereinafter the "completed operations exclusion").

\* \* \* \* \* \*

"products hazard" includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned

by or rented to the named insured and after physical possession of such products has been relinquished to others....

(Emphasis omitted.) (Hereinafter "product hazards exclusion.")

Coppola argues that these five provisions, when read together, create an inherent conflict respecting the scope of coverage under the policy. Coppola maintains this conflict requires that we construe the policy most strictly against Shelter—and in favor of Coppola—finding that the policy grants coverage to Coppola for the Simons' claims.

Shelter argues (1) that the above cited provisions do not conflict and (2) that if these provisions are found to be in conflict, the endorsement exclusions govern because the provisions of an endorsement prevail over inconsistent provisions contained in the body of the policy.

## II

In determining the meaning of an insurance contract and assessing whether it contains conflicting provisions, we are guided by well-settled principles of interpretation. Our starting point is, of course, the intent of the parties as manifested by the plain language of the policy. *Marez v. Dairyland Ins. Co.*, 638 P.2d 286, 289 (Colo.1981) ("Policy is not *sui generis* but is treated in the law in the same way as contracts are treated generally, and is to be interpreted according to the intent of the parties."); *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 18 (Colo.1990) ("In construing insurance policy, words should be given their plain meaning according to common usage ... and strained construction should be avoided." (citations omitted)). When construing the language of an insurance contract, its provisions cannot be read in isolation, but must be considered as a whole. *Security Ins. Co. of Hartford v. Houser*, 191 Colo. 189, 191, 552 P.2d 308, 310 (1976). When provisions of an insurance policy conflict, they are to be construed against the insurer and in favor of coverage to the insured. *See* 13 John A. Appleman & Jean

Appleman, *Insurance Law and Practice* § 7401, at 253–54 (1976).

■ It is also important to recognize that the determination of an insurance contract's meaning and whether it contains conflicting provisions is not answered by reference to what those who are experts in the construction of insurance contracts or those with a clear understanding of the legal effects of specific language might understand by reading a policy. *See Travelers Ins. Co. v. Jeffries–Eaves, Inc.*, 166 Colo. 220, 223, 442 P.2d 822, 824 (1968); *Standard Marine Ins. Co. v. Peck*, 140 Colo. 56, 60, 342 P.2d 661, 663 (1959); *Columbian Nat'l Life Ins. Co. v. McClain*, 115 Colo. 458, 461, 174 P.2d 348, 350 (1946). To the contrary, the construction of an insurance contract must be ascertained by reference to what meaning a person of ordinary intelligence would attach to it. *Standard Marine*, 140 Colo. at 60, 342 P.2d at 663.

■ The exception to exclusion (a) for a warranty of fitness or quality and the products hazard exclusion found in the endorsement are plainly in conflict. Exclusion (a) provides that "this exclusion does not apply to a warranty of fitness or quality of the named insured's product...." The endorsement exclusion, however, provides that coverage does not apply to damage included within the products hazard exception. Products hazard, as defined in the policy, encompass damage "arising out of the named insured's products or reliance upon a representation or warranty made at any time thereto...." Thus, the Shelter policy on the one hand excepts from exclusion certain warranties while the products hazard specifically excludes coverage for damage arising from reliance upon a warranty. The two provisions are in conflict respecting the policy's coverage for liability resulting from product warranties.

■ Similarly, there is a conflict between exclusion (a)'s exception for "work performed by or on behalf of the named insured ... in a workmanlike manner" and the completed operations exclusion. "Workmanlike" is defined as "worthy of a good workman: well performed, skillful."

*Webster's Third New Int'l Dictionary* at 2635 (1986). More specifically, workmanlike has been used to refer to the promise that a "building will be erected in a reasonably good and workmanlike manner and will be reasonably fit for the intended purpose." *Markman v. Hoefer*, 252 Iowa 118, 106 N.W.2d 59, 62 (1960). The completed operations hazard exclusion, however, covers myriad operations in which the warranty of workmanlike performance would be applicable. Additionally, a conflict arises due to exclusion (a)'s exception for a warranty of workmanlike performance and the endorsement exclusion for "reliance upon a ... warranty." Consequently, we find that these provisions are in conflict respecting the scope of coverage under Shelter's policy.

Shelter argues that these provisions are not in conflict. It argues that because exclusion (a) excepts coverage from "this exclusion," it cannot be read to grant coverage under the rest of the policy. In short, Shelter argues that an exception to an exclusion can never amount to a grant of coverage but by nature, can only limit coverage.

■ Although we recognize the technical merits of Shelter's argument, we nevertheless hold that these provisions are in conflict when viewed from the standpoint of a person of ordinary intelligence. As noted above, the meaning and effect of insurance contracts are not to be considered from the perspective of a person who has particular expertise in interpreting them. Given the broad grant contained in the general grant of coverage, and the exceptions found in exclusion (a) for warranties of fitness, quality, and workmanlike performance, we are of the opinion that a person of ordinary intelligence would conclude that the policy issued by Shelter covers damages resulting from the breach of such warranties—in spite of the endorsement's exclusions for damages resulting under the products hazard or completed operations hazard.

Thus, after considering the plain language of the insurance contract, we hold

that exclusion (a) and the endorsement exclusions are in conflict.

## III

Having found that the insurance contract contains conflicting provisions, we now consider whether these otherwise conflicting provisions are rendered harmonious by virtue of the fact that two exclusions are contained in an endorsement, and are not found in the body of the policy where exclusion (a) is found.

The court of appeals held exclusion (a) and the endorsement exclusions did not conflict because endorsements prevail over any inconsistent provisions contained in the body of the policy. In so holding, the court of appeals stated the general rule regarding conflicts between endorsement provisions and provisions found elsewhere in an insurance agreement.

 The general rule provides that when a conflict in an insurance contract arises between provisions contained in the body of the policy and provisions contained in an endorsement to that policy, the endorsement provisions prevail. 13A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 7537, at 146 (1976) ("If any irreconcilable conflict exists between provisions of the policy and provisions of an endorsement, then the latter must control.") Shelter relies heavily on *Martinez v. Hawkeye–Security Insurance Co.*, 195 Colo. 184, 576 P.2d 1017 (1978), also relied on by the court of appeals in *Shelter*, to support its contention that the general rule governs this case and compels a decision that the Shelter policy neither contains conflicting provisions nor does it provide coverage to Coppola for the Simons' claims.

In *Martinez* we addressed the question of whether a door installed with a faulty latch fell within the completed operations exclusion as defined in the policy issued by Hawkeye. There, the insured argued that the policy was ambiguous because bodily injury coverage for completed operations hazards was excluded in spite of the fact that the basic policy included coverage for bodily injury. In response to this assertion, we stated that "[a]n insurance policy and endorsement attached to it must be considered as a single instrument, and they should be construed together in the absence of an internal conflict which cannot be reconciled. The endorsement, being the last expression of intent, prevails if the language of the two conflicts." *Id.* at 187, 576 P.2d at 1019 (citations omitted).

The rationale which supports the general rule is that because the endorsement represents the last expression of intent of the contracting parties, it should prevail over other inconsistent provisions. 1 George J. Couch, *Cyclopedia of Insurance Law* § 4:36 (R. Anderson 2d rev. ed. 1984) ("As the indorsement is later in time, it should prevail over any conflicting provisions of the policy."); 7 Walter H.E. Jaeger, *Williston on Contracts* § 900, at 24 (3d. ed. 1963) (an endorsement "inconsistent with the printed provision of the policy will control because it embodies an agreement of the parties necessarily made subsequent to the date of execution of the policy to which it is attached, hence it represents the latest intentions of the contracting parties."). *But see Cyclopedia of Insurance Law* § 436 ("If there is an ambiguity arising because of difference of language used in indorsement and body of policy, language of entire contract is construed most strongly against insurer.").

 The uncontroverted evidence in this case established that the body of the policy and the endorsement were presented at the same time as a "single package" of insurance coverage to Coppola. The endorsement contained no separate signatures, nor was there any evidence or allegations that the endorsement had been separately negotiated.[2]

 Thus, we find that application of the rule laid down in *Martinez* is inapplicable to this case. There can be no justification for applying a rule when the rationale

---

2. When questioned about these facts in arguments before this court, Shelter responded that the general rule is simply a "legal fiction" and as such, it did not matter whether or not the justification for the "fiction" was in fact existent in this case.

which supports the rule is not present. To hold otherwise would require the rigid and formalistic application of a general rule, while ignoring the undisputed fact that the justification for the rule itself is not present. Consequently, we hold that the mere fact that the endorsement exclusions are contained in an "endorsement," as opposed to the body of the policy, insufficient grounds to find that the otherwise inconsistent insurance contract is rendered consistent and fully enforceable.

## IV

We hold that the policy issued by Shelter to Coppola contains inconsistent provisions and thus, must be construed against Shelter and in favor of coverage to Coppola. We hold further that the otherwise conflicting provisions of the policy are not rendered consistent and fully enforceable by virtue of the fact that the conflicting provisions are contained in the body of the policy and a contemporaneously issued endorsement to that policy.

Judgment is reversed and the case remanded to the court of appeals with directions to return to the trial court for further proceedings consistent with this opinion.

VOLLACK, J., dissents, and ERICKSON and LOHR, JJ., join the dissent.

### Justice VOLLACK dissenting:

The majority finds that certain provisions in an insurance contract issued by Shelter General Insurance Company (Shelter General) to Designer Spas and Hot Tubs (Designer Spas) are in conflict, maj. op. at 240, and that the insurance contract must be construed against Shelter General. Maj. op. at 242. However, issues of mootness and ripeness raised by the unique posture of this case bar those issues from this court's consideration. I respectfully dissent.

## I.

This case requires us to detail the histories of two proceedings—a tort action and a declaratory judgment action—which involve substantially the same parties. Both actions evolved out of the same set of facts.

In November 1987, Designer Spas took delivery of a hot tub in order to rebuild the equipment pack accompanying the hot tub. An employee of Designer Spas installed a thermostat manufactured by Eaton Corporation (Eaton) in the equipment pack. The thermostat indicated that the temperature of the hot tub would not exceed 115 degrees.

On November 17, 1987, Designer Spas delivered the hot tub and equipment pack to Marilyn and James Simons' residence. On November 19, an employee of Designer Spas completed installation of the equipment pack onto the hot tub. The following morning, Marilyn Simon attempted to step onto the first submerged step of the hot tub. When her foot touched the water, she realized that the water was extremely hot. While withdrawing her foot, Marilyn Simon lost her balance and fell into the hot tub. The water in the hot tub had attained a temperature of approximately 160 degrees. Marilyn Simon sustained second- and third-degree burns to her legs and torso as a result of her fall.

The Simons subsequently filed a complaint against Eaton and Designer Spas, among others. In their complaint, the Simons alleged that Designer Spas had reconditioned a water temperature control unit manufactured by Eaton. The Simons asserted that "Designer Spas was negligent in its reconditioning of the water temperature control device."

Designer Spas had contracted with Shelter General to insure Designer Spas in November 1987.[1] On November 25, 1988, Shelter General filed a complaint for a declaratory judgment that Shelter was not obligated to defend or indemnify Designer

---

1. In paragraph 20 of the parties' Agreed Statement of Facts, on or about November 24, 1987, Designer Spas tendered a premium payment to Shelter General. Shelter General accepted the payment and does not dispute the fact that Designer Spas' policy was renewed on November 20, 1987, at 12:01 a.m. and thus covered Designer Spas at the time of the accident.

Spas in the Simons' tort action. Designer Spas filed an answer to the complaint on January 4, 1989, contending that Designer Spas reasonably expected Shelter General to defend and indemnify Designer Spas, and that the exclusions in the insurance policy were ambiguous.

Designer Spas filed a brief regarding Shelter General's duty to defend on May 8, 1989. Designer Spas petitioned the district court to enter an order stating that Shelter General had a duty to defend and indemnify Designer Spas in the Simons' tort action. Shelter General filed an opening brief in the declaratory judgment action, asking the district court to enter a judgment declaring that it has no duty to defend or indemnify Designer Spas in that action. Designer Spas filed a reply brief, requesting the district court to enter an order requiring Shelter to defend and indemnify Designer Spas in the Simons' tort action.

On August 8, 1989, *the Simons* intervened in the declaratory judgment action.[2] Aligning themselves with Designer Spas, the Simons argued to the district court that Shelter General had a duty to defend and indemnify Designer Spas. On December 22, 1989, the Simons filed an opening brief in the declaratory judgment action, requesting the district court to enter a judgment finding that Shelter General has the duty to defend and indemnify Designer Spas. Shelter General filed an answer brief on January 4, 1990, again seeking a judgment that Shelter General has no duty to defend or indemnify Designer Spas in the Simons' tort action.

On January 30, 1990, the district court entered a declaratory judgment stating that Shelter General had no duty under the insurance contract to defend or indemnify Designer Spas in the Simons' tort action. The district court based its conclusion on its interpretation of the "completed operations hazard" and the "products hazard" exclusions in the insurance contract.

On February 13, 1990, *the Simons* filed a notice of appeal of the declaratory judg-ment with the court of appeals. Approximately one month later, on March 16, Designer Spas sought to join in the Simons' notice of appeal filed with the court of appeals. On September 24, 1990, *the Simons* filed an opening brief with the court of appeals, seeking an order reversing the district court, finding that the insurance policy issued by Shelter General provided coverage to Designer Spas in the tort action brought by the Simons. Designer Spas filed a motion to join in the Simons' opening brief with the court of appeals.

While the declaratory judgment was pending in the court of appeals, the Simons' tort action proceeded to trial. On July 31, 1991, the district court entered judgment on a jury verdict in the amount of $900,000, in favor of the Simons and against defendant Eaton in the Simons' tort action. The jury found that, while Designer Spas was negligent, its negligence did not cause the Simons' injuries or damages, and did not enter judgment against Designer Spas.

On August 1, 1991, the court of appeals found that the "completed hazard exclusion" applied to the facts as stipulated. The court of appeals affirmed the district court's declaratory judgment. The Simons and Designer Spas separately filed petitions for rehearing with the court of appeals which were denied.

On October 29, 1991, *counsel for the Simons* filed a petition for a writ of certiorari on behalf of both the Simons and Designer Spas, with this court. In their statement of the case, counsel for the Simons identified the issue as "whether a policy of insurance issued by [Shelter General] ... to [Designer Spas] ... provides coverage to Designer Spas for certain tort claims brought by the Simons." *Counsel for the Simons did not then inform this court that a jury had returned a verdict in favor of Designer Spas.*

This court subsequently granted certiorari to determine whether the court of appeals erred in its opinion. Counsel for the

**2.** The Simons filed a motion to intervene on August 1, 1989, and the district court granted this motion on August 8, 1989.

Simons filed an opening brief with this court on behalf of both the Simons and Designer Spas. In footnote 2 of their opening brief, counsel for the Simons informed this court that, on July 31, 1991, a jury returned a verdict in favor of Designer Spas. Counsel for the Simons contended that "the issues raised in this appeal are not moot since [Eaton] appealed the trial court judgment" and thus there is *a possibility* that the judgment may be reversed and the case remanded for a new trial. Counsel for the Simons additionally contended that the issues are not moot because "Designer Spas *will be seeking* its attorneys fees and defense costs under the policy." (Emphasis added.)

Designer Spas did not appear before this court at oral argument. Counsel for the Simons did appear, and argued that the court of appeals erred in its interpretation of the insurance contract. Counsel for the Simons expressly stated during oral argument that they were not representing Designer Spas. Counsel for the Simons also stated that Shelter General paid for Designer Spas' defense in the Simons' tort action.

In light of the posture of this case, I find that resolution of the issues is not necessary because the issues raised in the petition for certiorari are moot.

## II.

### A.

#### Mootness

This court has followed the principle that "[a]ppellate courts will not render opinions on the merits of appeals when issues presented in litigation become moot because of subsequent events." *American Drug Store, Inc. v. City and County of Denver,* 831 P.2d 465, 469 (Colo.1992) (citing *Van Schaack Holdings, Ltd. v. Fulenwider,* 798 P.2d 424, 426–27 (Colo.1990); *Zoning Bd. of Adjustment v. DeVilbiss,* 729 P.2d 353 (Colo.1986)). "A case is moot when a judgment, if rendered, would have no practical legal effect upon the existing controversy." *American Drug Store,* 831 P.2d at 469 (quoting *Van Schaack,* 798 P.2d at 426).

In *American Drug Store,* we were called on to evaluate whether the notice provisions of a sales and use tax assessment issued by the City and County of Denver conformed to the requirements of section 29–2–106.1, 12A C.R.S. (1986). *Id.* at 468. We concluded that the issue was moot because the tax assessment at issue had become final as against the complaining party. *Id.* at 468–69. In other words, we declined to scrutinize the content of the notice because the tax assessment was binding on the complaining party, and thus there was no controversy between the complaining party and the City and County of Denver. *Id.*

In the present case, no judgment against Designer Spas exists as a result of the tort action. Thus, any determination by this court that Shelter General has a duty to indemnify Designer Spas has no legal effect. Similarly, any determination by this court that Shelter General had a duty to defend Designer Spas has no legal effect because Shelter General does not now seek to recover costs it incurred by defending the Simons' tort action because Shelter General paid for Designer Spas' defense under a "reservation of rights clause." *See infra* note 3.

### B.

#### Ripeness

Counsel for the Simons indicated in their opening brief that "Designer Spas *will be seeking* its attorneys fees and defense costs under the policy." (Emphasis added.) The gravamen of this statement is that Designer Spas is *not now* before this court seeking to recover its costs.

Designer Spas did request reimbursement for its costs incurred in defending the declaratory judgment action in its motion to amend its answer filed on March 15, 1989, in the district court, well before the jury declined to enter a judgment against Designer Spas. Designer Spas did not, however, appear at oral argument before this court. Designer Spas joined in the

briefs filed by counsel for the Simons, and did not individually assert any claims for costs with this court. Counsel for the Simons stated at oral argument that they do not represent Designer Spas. Accordingly, counsel for the Simons are not before this court seeking to recover the costs incurred by Designer Spas in defending the declaratory judgment action.

The present case stems from the declaratory judgment action filed by Shelter General against Designer Spas. The Simons are the "complaining party" currently before this court, who appear to be securing a "deep-pocket" defendant, Shelter General, in the event that the appeal perfected by Eaton results in a new trial. While Eaton's appeal *may* result in a new trial wherein Designer Spas *may* be found liable, such potential for future injury to Designer Spas does not justify review on the merits in the present action where, based on the parties' arguments, any determination by this court will have no practical legal effect on any dispute between Shelter General and Designer Spas.[3] *See Jones v. District Court*, 780 P.2d 526, 533 (Colo.1989) (Vollack, J., dissenting). The court of appeals judgment should be vacated due to the issues of mootness and ripeness raised by the unique posture of this case.

I am authorized to say that Justice ERICKSON and Justice LOHR join in this dissent.

---

**3.** The majority contends that the issues raised in the present case are not moot because "Shelter provided a defense to [Designer Spas] *under a reservation of rights*" clause. The majority further contends that "we need not be concerned with the question whether these rights will indeed be invoked by Shelter." Maj. op. at 238 n. 1. At oral argument, the following colloquy occurred:

COURT: Designer Spas paid for its own defense, is that—at the trial? Or did the insurance company—

COUNSEL: Shelter Insurance Company paid for its defense, under a reservation of rights.

COURT: And has Shelter sought recovery from Designer Spas for the cost of its defense?

COUNSEL: Not yet, not to my knowledge, no.

Shelter does not now seek an interpretation of the reservation of rights clause, as the majority notes; as such, the issues remain moot.