**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY, Defendant.**

**Civil Action No. 13–cv–00079–PAB–KMT**

United States District Court, D. Colorado.

Signed September 30, 2016

Christopher Del Blum, Ian Andrew Cooper, Jared Kent Clapper, Joseph Peter Lang, Matthew Jay Fink, Nicolaides Fink Thorpe Michaelides Sullivan LLP, John William Patton, Jr., Paul Donald Motz, Amy Marie Kunzer, Patton & Ryan LLC, Chicago, IL, Douglas Adam Stevens, Caplan & Earnest, LLC, Boulder, CO, for Plaintiff.

Aaron Lundstrom Hayden, Anne E. Zellner, Brett Marshall Godfrey, James Andrew Johnson, Godfrey Johnson, P.C., Englewood, CO, for Defendant.

## ORDER

PHILIP A. BRIMMER, United States District Judge

This matter is before the Court on Motion for Summary Judgment [Docket No. 549] and Motion to Supplement the Summary Judgment Record [Docket No. 698] of plaintiff National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), and the Motion for Partial Summary Judgment Regarding National Union's Separate, Per Project, Completed Operations Coverage [Docket No. 556] of defendant Federal Insurance Company ("Federal"). This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## I. BACKGROUND [1]

This case arises out of an insurance coverage dispute. In early 1998, former defendant Intrawest ULC ("Intrawest"), a ski-resort developer, engaged former third-party defendant Willis,[2] an insurance broker, to negotiate and secure insurance coverage for its construction projects.

Docket No. 549 at 5, Statement of Undisputed Material Fact ("SUMF") 1–3; Docket No. 556 at 5, SUMF 4, 6.[3] Willis sought proposals from six insurance companies. Docket No. 549 at 8, SUMF 18. On April 27, 1998, Geoffrey Hall, a National Union representative, sent a proposal to Willis that included the following chart:

### Limits of Liability

**Per Location:**

| | |
|---|---|
| Bodily Injury & Property Damage | $2,000,000 Each Occurrence |
| Personal/Advertising Injury | $2,000,000 Each Occurrence |
| General Aggregate ** | $5,000,000 *Per Project |
| Medical Expense | $5,000 |
| Fire Damage Legal | $100,000 |
| Products/Completed Operations Aggregate | $5,000,000 |

**All Locations**

| | |
|---|---|
| General Aggregate | $15,000,000 |
| Products Completed Operations | $5,000,000 |

**Reinstatement of Aggregate Limits Annually except for the five (5) Year Products/Completed Operations Extension Period which will have One Aggregate for the Extended Reporting Period. *There is an option for a ten (10) year Products/Completed Operations Extension period in lieu of the five (5) year listed above for an Additional Premium of $350,000.

*Id.*, SUMF 21, 23;[4] Docket No. 549–16 at 2.

Intrawest purchased five consecutive general liability policies from National Union with effective dates of April 30, 1998 through June 30, 2002. Docket No. 549 at 5–6, SUMF 5; Docket No. 556 at 5, SUMF 5. The declarations pages of each policy list a $5 million general aggregate and a $5 million completed operations aggregate. Docket No. 549 at 6, SUMF 6. "Section III–Limits of Insurance" of the policies

---

1. The following facts are undisputed unless otherwise indicated.

2. On November 19, 2013 Intrawest filed a third-party complaint against Willis North America, Inc. f/k/a Willis Corroon Corporation, Willis of New York, Inc., Willis Insurance Brokerage of Utah, Inc., Willis of New Jersey, Inc., Willis Construction Services Corporation of New Jersey f/k/a Willis Corroon Construction Services Corporation of New Jersey, Willis Corroon Construction Services Corporation of Connecticut, Willis Corroon Construct ion Services Corporation, Willis of New Hampshire, Inc. f/k/a Willis Corroon Corporation of New Hampshire, Willis of Massachusetts, Inc., and John Doe Willis En-

tity, Docket No. 136, which entities the Court refers to collectively as "Willis."

3. Federal disputes this assertion, but does not provide any specific citation or factual explanation to support its denial. *See* Practice Standards (Civil cases), Judge Philip A. Brimmer, § III.F.3.b.iv. Thus, this statement is undisputed.

4. Federal disputes this assertion, but does not provide any specific citation or factual explanation to support its denial. *See* Practice Standards (Civil cases), Judge Philip A. Brimmer, § III.F.3.b.iv. Thus, this statement is undisputed.

explains that "[t]he Limits of Insurance shown in the Declarations and rules below fix the most we will pay." *Id.*, SUMF 8. That section also provides that the "general aggregate limit" is the most National Union will pay for "Other Than Prod–Comp Operations" and that the "completed operations aggregate limit" is the most National Union will pay for completed operations damages. *Id.*; Docket No. 549–7 at 2, 4. Intrawest selected the optional ten-year extension. Docket No. 556 at 11, SUMF 40.

On May 13, 1998, Craig Parrow, a Willis representative, wrote to Geoffrey Hall, a National Union representative, and asked whether the completed operations coverage "applies on a 'per project' basis similar to the 'primary' CGL." *Id.* at 9, SUMF 29. Mr. Parrow's reference to the "primary CGL" pertained to the ongoing operations limit, which had a $5 million per project limit rather than a per location limit. *Id.* at 10, SUMF 30. Mr. Hall responded that "there is only one aggregate for the entire Extension Period. The limit will apply per project but the total aggregate for all losses in the Extension will remain $5,000,000." *Id.*, SUMF 32.

On May 22, 1998, Mr. Hall issued a binder to Willis. *Id.*, SUMF 36. The binder issued to Willis contained the same limits as set forth in National Union's proposal. *Id.* at 11, SUMF 38. It took the parties more than a year to perfect the final terms of the 1998–1999 policy. Docket No. 556 at 7, SUMF 21.

On February 22, 1999, William Bridgman of Willis sent an email to Mr. Parrow and Joseph Riela of National Union confirming that Intrawest wanted a ten-year term, agreeing that the $5 million completed operations aggregate did not reinstate annually, and requesting confirmation that the aggregate applied on a "per project basis." Docket No. 556 at 8, SUMF 24. National Union thereafter provided a copy of the 1998–1999 policy to Willis with the following endorsement:

It is agreed that, Products Completed Operations coverage is extended for a period of five (5) years which will commence when that portion of the project is put to its intended use or a temporary or permanent certificate of occupancy is issued. The products/completed operations limit is $5,000,000 each occurrence and $5,000,000 Aggregate for the extended completed operations period.

All other terms, conditions and exclusions of this policy remain unchanged.

Docket No. 549 at 11–12, SUMF 43; Docket No. 549–28 at 2.

On March 2, 1999, Mr. Parrow identified mistakes in the endorsement to the policy and wrote to Mr. Riela. Docket No. 549 at 12, SUMF 44. Mr. Parrow wrote to Mr. Riela that the endorsement should say that the extended reporting period is ten years and that the completed operations aggregate applies "per project." *Id.* On March 12, 1999, Mr. Riela responded to Mr. Parrow, stating that "we are not in agreement that the $5 million aggregate [applies] separately per project. To clarify, the $5 million aggregate, as stated in the binder, applies to all projects and is not reinstated annually." *Id.*, SUMF 45. Later that day, Mr. Bridgman forwarded the May 13, 1998 email exchange between Mr. Hall and Mr. Parrow to Mr. Riela. Docket No. 549–31. Mr. Riela contacted Mr. Hall of National Union to confirm that the agreement was for a single $5 million total completed operations aggregate. Docket No. 549 at 12, SUMF 47. Mr. Hall clarified that the $5 million per location aggregate applied "per project," but confirmed to Mr. Riela that the total completed operations limit was $5 million. *Id.*, SUMF 48. Mr. Riela responded to Mr. Hall's email by stating, "based on your response, the Completed Operations Agg does apply on a per project basis. I will make this change on the endorsement." *Id.*, SUMF 49.

On May 3, 1999, National Union executed a number of endorsements that amended and became part of the policies. Docket No. 556 at 9, SUMF 27. One such endorsement was Endorsement 9, which included the following paragraph:

> It is also agreed and understood that the Products and Completed Operations Aggregate is not reinstated annually, however, it does apply separately on a per project basis.

Docket No. 549 at 7, SUMF 12; *id.* at 13, SUMF 52.

On May 10, 2000, Intrawest executed the Indemnity Agreement. *Id.* at 15, SUMF 63. The Indemnity Agreement states:

> National Union will issue the insurance policies listed in the Schedule(s). Such policies ... are governed by this Agreement.... This Agreement, together with the Schedule(s) and Policy(ies), constitutes the Program. The Program is a uniquely negotiated, single contract and no part of the Program would have been issued without the other parts being in force. Unless otherwise agreed, should the parties later adopt revised or different Schedule(s) or issue additional Policies, such Schedule(s) and Policy(ies) shall be subject to this Agreement and be part of the Program.

*Id.*, SUMF 62. The Paid Loss Addendum and Policy and Funding Schedule (the "Schedule") attached to the Indemnity Agreement contained a Policy Limits section, which provides:

| General Liability: | Per Project | |
|---|---|---|
| | $2,000,000 | per occurrence |
| | $5,000,000 | General Aggregate |
| | $5,000,000 | Completed Operations Aggregate |

| | All Projects *(1) | |
|---|---|---|
| | $15,000,000 | General Aggregate |
| | $5,000,000 | Completed Operations Aggregate |

Docket No. 549–5 at 2.

Endorsement 9 was included with the policy during its first two years, and the parties agree that it was mistakenly omitted from the Policy during years 3, 4, and 5. Docket No. 556 at 10, SUMF 32.

On January 14, 2013, National Union filed the complaint in the instant case seeking a declaratory judgment that the National Union policies' aggregate limit is $5 million and that, upon paying the aggregate limit, National Union's obligations under the National Union policies are satisfied. Docket No. 1 at 11–12. On October 2, 2013, Federal filed an answer and alleged three counterclaims against National Union: (1) equitable subrogation and (2) equitable indemnity for amounts Federal paid to settle claims against Intrawest after National Union took the position that the $5 million aggregate limit had been exhausted; and (3) a declaratory judgment that each project had an independent $5 million aggregate limit. Docket No. 86 at 11–14.

On October 30, 2015, National Union filed a motion for summary judgment on its declaratory judgment claim and Federal's three claims. Docket No. 549 at 50. On November 2, 2015, Federal filed a motion for summary judgment on its declaratory judgment claim. Docket No. 556 at 21.

On March 14, 2016, National Union filed a motion to supplement the summary judgment record. Docket No. 698. National Union requests to supplement the summary judgment record with evidence regarding Federal's reinsurance materials. *Id.* at 3.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is warranted when

the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

■ Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal quotation marks omitted)). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *see* Fed. R. Civ. P. 56(e). "To avoid summary judgment, the nonmovant must establish, at a minimum,

an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115 (citation omitted). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010). However, where, as here, there are cross motions for summary judgment, the reasonable inferences drawn from affidavits, attached exhibits, and depositions are rendered in the light most favorable to the non-prevailing party. *Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004). Furthermore, "[w]hen the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotation marks omitted).

## III. ANALYSIS

### A. Motion to Supplement the Summary Judgment Record

■ National Union seeks to supplement the summary judgment record with documents that it obtained from Federal after filing its summary judgment motion. Docket No. 698 at 4. National Union argues that "Federal's reinsurance documents further evidence that Federal understood the National Union Program provides a $5 million total completed operations limit." *Id.* at 5. Federal responds that the documents National Union seeks to add to the record do not create undisputed material facts in National Union's favor and do not dispute any material fact set forth by Federal. Docket No. 709 at 5.

The earliest document that National Union seeks to submit to supplement the

summary judgment record is dated February 12, 2010, Docket No. 699 at 19, which is nearly a decade after the policy was negotiated and executed. The Court finds that the reinsurance documents will not assist the Court in its duty to "interpret [the] contract in a manner which effectuates the manifest intention of the parties at the time the contract was signed." *Roemmich v. Lutheran Hospitals & Homes Soc. of Am.*, 934 P.2d 873, 875 (Colo. App. 1996) (citing *Neves v. Potter*, 769 P.2d 1047 (Colo. App. 1989)). Accordingly, the Court will deny National Union's motion to supplement the summary judgment record.

### B. Completed Operations Coverage Limit

■ Under Colorado law,[5] "[t]he interpretation of an insurance policy, like any written contract, presents a question of law and, therefore, is appropriate for summary judgment." *Tynan's Nissan, Inc. v. Am. Hardware Mut. Ins. Co.*, 917 P.2d 321, 323 (Colo. App. 1995) (citing *Bumpers v. Guarantee Trust Life Insurance Co.*, 826 P.2d 358 (Colo. App. 1991)).

■ When construing the terms of an insurance policy, Colorado courts apply traditional principles of contract interpretation. *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 819 (Colo. 2004); *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995). Courts are to give effect to the intent and reasonable expectations of the parties and to enforce the policy's plain language unless it is ambiguous. *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007). A "court should interpret a contract 'in its entirety with the end in view of seeking to harmon-

ize and to give effect to all provisions so that none will be rendered meaningless.'" *Copper Mountain, Inc. v. Industrial Systems, Inc.*, 208 P.3d 692, 697 (Colo. 2009).

■ Whether the contract is ambiguous is a question of law. *Id.* Contract terms are ambiguous when they can be read to have more than one reasonable interpretation. *Hecla Min. Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1090 (Colo. 1991). In making the ambiguity determination, courts are to view the policy as a whole, using the generally accepted meaning of the words employed. *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1060 (Colo. 2005).

■ "Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract." *Ad Two, Inc. v. City & Cty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000) (citing *USI Properties East, Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997)). Courts "m ay consider extrinsic evidence regarding the meaning of the written terms, including evidence of local usage and of the circumstances surrounding the making of the contract" in order to determine whether a contract term is ambiguous. *Pub. Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006). However, courts may not consider extrinsic expressions of intent by the parties. *Id.* The mere fact that the parties disagree about the meaning of a provision does not in itself mean the term is ambiguous. *Snipes v. Am. Fam. Mut. Ins. Co.*, 134 P.3d 556, 558 (Colo. App. 2006). But, "w hen an ambiguity has been determined to exist, the meaning of its terms is generally an issue of fact to be determined in

---

5. The parties appear to assume that Colorado law applies. *See, e.g.,* Docket No. 549 at 41; Docket No. 556 at 11. The Court concurs. *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346

(10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption").

the same manner as other factual issues." *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005).

■■■■ "An insurance policy and endorsement attached to it must be considered as a single instrument, and they should be construed together in the absence of an internal conflict which cannot be reconciled. The endorsement, being the last expression of intent, prevails if the language of the two conflicts." *Simon v. Shelter General Ins. Co.*, 842 P.2d 236, 241 (Colo. 1992) (citing *Martinez v. Hawkeye–Security Insurance Co.*, 195 Colo. 184, 576 P.2d 1017, 1019 (1978)).

■■ The parties dispute whether the Program provides, as Federal argues, a $5 million completed operations aggregate for each project, which is not exhausted by the covered expenditures at any other project, or, as National Union argues, a total completed operations aggregate of $5 million for all Intrawest projects. The focus of the dispute is on the language of Endorsement 9. National Union contends that Endorsement 9 memorializes the parties' agreement about the terms of the policy reached in the May 13, 1998 emails between Mr. Hall and Mr. Parrow that "[t]he limit will apply per project but the total aggregate for all losses in the Extension will remain $5,000,000." Docket No. 549 at 36; Docket No. 549–22 at 1. Federal relies on the phrase "separately on a per project basis" in Endorsement 9, which it says unambiguously establishes that "each project has its own $5 million products and completed operations aggregate limit which is not shared with any other project." Docket No. 556 at 18.

In order to determine the meaning of the phrase "separately on a per project basis," the Court first examines the language of Endorsement 9, which states:

It is agreed that, Products Completed Operations coverage is extended for a period of ten (10) years which will commence when that portion of the project is put to its intended use or a temporary or permanent certificate of occupancy is issued. The products/completed operations limit is $5,000,000 each occurrence and $5,000,000 Aggregate for the extended completed operations period.

It is also agreed and understood that the Products and Completed Operations Aggregate is not reinstated annually, however, it does apply separately on a per project basis.

All other terms, conditions and exclusions remain the same.

Docket No. 556–3 at 1; Docket No. 549–7 at 6. The first paragraph refers to the completed operations coverage.[6] The second sentence of the first paragraph says that the policy limit is $5 million for each occurrence, meaning that National Union will not pay more than $5 million for each occurrence. The second sentence also states that there is a $5 million aggregate for the extended completed operations period.

The second paragraph of Endorsement 9 refers to the aggregate. It states that, while the aggregate is not reinstated annually, meaning that "there is not a new aggregate limit each year, only $5 million for the entire ten-year period," Docket No. 671 at 13, "it does apply separately on a per project basis." Federal interprets this to mean that "each project has its own $5 million products and completed operations aggregate limit which is not shared with

---

**6.** The policy provides two different types of coverage—"ongoing operations," which covers bodily injury and property damage, and "completed operations," which covers damage that occurs after completion of construction. *See* Docket No. 549 at 5, SUMF 3.

any other project." Docket No. 556 at 18. National Union says that "separately on a per project basis" means something completely different, namely, that "the $5 million completed operations aggregate can be fully used at any one or more projects at any of the locations" and that the "single $5 million completed operations limit was not required to be shared equally among all the projects or locations." Docket No. 549 at 31.

If Endorsement 9 were the only document relevant to the parties' coverage dispute, Federal's interpretation would prevail as the more natural reading of the terms. However, Endorsement 9 does not constitute the entire insurance contract. The Court therefore looks to the other parts of the insurance contract to determine whether the parties' competing interpretations of Endorsement 9 are supported or contradicted. *See Copper Mountain*, 208 P.3d at 697.

On May 10, 2000, Intrawest executed the Indemnity Agreement. Docket No. 549 at 15, SUMF 63; Docket No. 556 at 10, SUMF 33.[7] The Indemnity Agreement states, in pertinent part:

> [National Union] will issue the insurance policies listed in the Schedule(s). Such policies and all renewal addendum's [sic] are governed by this Agreement and are referred to herein as the "Policy(ies)". This Agreement, together with the Schedule(s) and Policy(ies), constitutes the Program. The Program is a uniquely negotiated, single contract and no part of the Program would have been issued

without the other parts being in force. Unless otherwise agreed, should the parties later adopt revised or different Schedule(s) or issue additional Policies, such Schedule(s) and Policy(ies) shall be subject to this Agreement and be part of the Program.

Docket No. 549–4 at 2. Federal argues that the Indemnity Agreement "should not be considered when determining the terms of coverage" because it is not an endorsement. Docket No. 556 at 17. Federal further contends that "the Indemnity Agreement ... relied upon by National Union set forth how the pricing of the Program is to work, including premium calculations and security requirements. These documents do not determine the scope or limits of coverage available under the policies." *Id.* However, the parties' stated intent in the Indemnity Agreement contradicts Federal's argument. The plain language of the Indemnity Agreement establishes that National Union and Intrawest intended the Indemnity Agreement to be part of the Program and that no part of the Program would have been entered into without the other parts being in force. Thus, the Court concludes that the Indemnity Agreement is part of the insurance contract and, in material part, should be considered when construing the meaning of terms used in Endorsement 9.

Attached to the Indemnity Agreement is the Schedule. The Schedule, which the Indemnity Agreement indicates is a constituent part of the Program, sets out the policy terms as follows:

---

**7.** There are no facts in the record that clearly indicate when the Indemnity Agreement was drafted or when it was sent to Intrawest. The first page of the indemnity agreement states, "Made this 30th day of April, 1998." Docket No. 549–4 at 1. There are also emails dated March 10 and April 5, 2000, between Mr. Bridgman and Mr. Parrow that reference the Indemnity Agreement. *See* Docket No. 549 at 16, SUMF 68–69.

General Liability:    Per Project
        $2,000,000  per occurrence
        $5,000,000  General Aggregate
        $5,000,000  Completed Operations Aggregate

    All Projects *(1)[8]
        $15,000,000 General Aggregate
        $5,000,000  Completed Operations Aggregate

**[Editor's Note:** The preceding image contains the reference for footnote [8]]

Docket No. 549 at 15, SUMF 64; Docket No. 549-5 at 2. Under the heading "Per Project," the terms are consistent with Federal's interpretation of Endorsement 9, namely, that there is a $5 million completed operations aggregate which applies "per project." However, the Schedule also contains language that is inconsistent with Federal's interpretation of Endorsement 9. Under the heading "All Projects," the Schedule indicates that the completed operations aggregate is $5 million. This suggests that for all projects there is an aggregate or cumulative limit of $5 million. It would be unreasonable to read the $5 million "Per Project" completed operations aggregate to mean the same thing as the "All Projects" completed operations aggregate. The limits of the "general aggregate" increase from $5,000,000 on a "per project" basis to $5 million on an "all projects" basis, which indicates that the terms "Per Project" and "All Projects" have different meanings. Thus, "All Projects" means that the $5 million completed operations aggregate applies cumulatively to the projects rather than separately. Federal does not attempt to explain this contradiction to its interpretation of the policy.

The question then arises whether the language of Endorsement 9, "separately on a per project basis," and the language of the Schedule that "All Projects" have a $5 million completed operations aggregate contradict one another (and thereby suggest an ambiguity) or whether, properly interpreted, they do not conflict.

■■■ The Court may refer to extrinsic evidence to determine whether there is an ambiguity in the contract terms chosen by the drafters. "A document is ambiguous when it is reasonably susceptible to more than one meaning." *Cheyenne Mountain School Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993) (internal quotation omitted). "In deciding whether a contract is ambiguous, a court may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract. However, the court may not consider the parties' own extrinsic expressions of intent." *Id.* (internal quotation omitted); *see also MemoryTen, Inc. v. Silicon Mountain Holdings*, 92 F.Supp.3d 176, 185 (S.D.N.Y. 2015) (applying Colorado law and finding that, "[w]ithin the four corners of the text . . . there is no ambiguity to be found; MemoryTen's preferred interpretation is simply the opposite of what the text plainly states. . . . [H]owever, the Court considers the contextual and extrinsic evidence that MemoryTen argues supports its interpretation, or at least evinces ambiguity."). While extrinsic evidence may not "be used

---

**8.** This footnote in the policy provides definitions of "Townhouse" and "Condominium" for purposes of the application of limits of liability, self-insured retention, and loss limits. *See* Docket No. 549-5 at 2.

to contradict the language of the written instrument," it may properly be used to "explain and give context to the language." *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1236–37 (Colo. 1998). Here, given the parties' use of facially contradictory language, the Court determines it is appropriate to examine extrinsic evidence to determine if the context of the parties' use of the terms sheds light on the parties' intent and on the terms' proper interpretation. *See id.* at 1235 (noting that "courts frequently admit extrinsic evidence provisionally, not for the purpose of 'varying or contradicting' the writing, but to determine the fact that it is indeed unambiguous.") (quoting 4 Samuel Williston, *A Treatise on the Law of Contracts* § 601, at 311 (Jaeger ed. 1961)); Restatement (Second) of Contracts § 212 cmt. b ("Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.").

In order to understand why the words "separately on a per project basis" appear in Endorsement 9, it is necessary to examine National Union's initial proposal for coverage to Intrawest. The limits of liability were set out as follows:

**Limits of Liability**

**Per Location:**

| | |
|---|---|
| Bodily Injury & Property Damage | $2,000,000 Each Occurrence |
| Personal/Advertising Injury | $2,000,000 Each Occurrence |
| General Aggregate ** | $5,000,000 *Per Project |
| Medical Expense | $5,000 |
| Fire Damage Legal | $100,000 |
| | |
| Products/Completed Operations Aggregate | $5,000,000 |

**All Locations**

| | |
|---|---|
| General Aggregate | $15,000,000 |
| Products Completed Operations | $5,000,000 |

**Reinstatement of Aggregate Limits Annually except for the five (5) Year Products/Completed Operations Extension Period which will have One Aggregate for the Extended Reporting Period. *There is an option for a ten (10) year Products/Completed Operations Extension period in lieu of the five (5) year listed above for an Additional Premium of $350,000.

Docket No. 549 at 8, SUMF 23;[9] Docket No. 549–16 at 2. Under the heading "Per Location," the completed operations aggregate is $5 million. The general aggregate is also $5 million, but additionally indicates that the $5 million limit applies "Per Project."[10] Thus, while the other limits apply

9.  Federal disputes this assertion, but does not provide any specific citation or factual explanation to support its denial. *See* Practice Standards (Civil cases), Judge Philip A. Brimmer, § III.F.3.b.iv. Thus, this statement is undisputed.

10.  At some locations, Intrawest had multiple construction projects. *See, e.g.,* Docket No.

"per location," the general aggregate applies "per project."

On May 13, 1998, Mr. Parrow (Willis) emailed Mr. Hall (National Union) about the proposal. Among other things, Mr. Parrow asked Mr. Hall whether the completed operations coverage "applies on a 'per project' basis similar to the 'primary CGL.'" Docket No. 549 at 9, SUMF 29. Mr. Parrow's use of the term "primary CGL" referred to the ongoing or general operations limit. *Id.* at 10, SUMF 30. Mr. Hall responded that "there is only one aggregate for the entire Extension Period. The limit will apply per project but the total aggregate for all losses in the Extension will remain $5,000,000." *Id.*, SUMF 32. This exchange indicates two things. First, Intrawest's concern related to whether the completed operations limit applied on a "per location" basis or, like the general aggregate limit, on a "per project" basis. Second, National Union emphasized that, while it was willing to apply the "per location" limit on a "per project" basis similar to the general aggregate limit, the "all locations" limit (i.e., the "total aggregate") for all losses "remains" at $5 million. Nothing in this exchange suggests that Mr. Parrow asked that each project have a completed operations aggregate of $5 million which is not shared by any other project or that National Union gratuitously provided one.

Months later, National Union sent an endorsement to Willis that said

It is agreed that, Products Completed Operations coverage is extended for a period of five (5) years which will commence when that portion of the project is put to its intended use or a temporary or permanent certificate of occupancy is issued. The products/completed opera-

tions limit is $5,000,000 each occurrence and $5,000,000 Aggregate for the extended completed operations period.

All other terms, conditions and exclusions remain unchanged.

Docket No. 549 at 11–12, SUMF 43. On March 2, 1999, Mr. Parrow wrote to Mr. Riela (National Union) pointing out some corrections that needed to be made to the endorsement, namely, that the

Products and Completed Operations Extension Endorsement, reference to 5 years should be replaced with 10 years. Also, the endorsement should indicate that "it is agreed that the Products and Completed Operations Aggregate is not reinstated annually". Furthermore, the endorsement should indicate that the Products and Completed Operations Aggregate applies separately "Per Project".

Docket No. 549–29 at 2. In regard to the completed operations limit, this is the first use of the phrase "separately per project." Mr. Parrow does not couch the "separately per project" language as a new proposal. He identifies issues that the parties "are still negotiating" in a separate section of his email. *Id.* Rather, he identifies what the endorsement language "should indicate," meaning that the language should be revised to conform to the parties' previous understanding.

Because it seemed as if Mr. Riela, who had replaced Mr. Hall as the contact person on this issue, misunderstood Mr. Parrow's suggestion as to the per project language, *see* Docket No. 620 at 17, Mr. Bridgman (Willis) replied by forwarding to Mr. Riela the May 13, 1998 email exchange with Mr. Hall. *See* Docket No. 549–31. Mr. Riela conferred with Mr. Hall and con-

---

549 at 9, SUMF 26. Therefore, a "per project" limit would apply to each project at a given location.

firmed that "the $5 million completed operations aggregate could be used all at one project as opposed to pro rata at each project" and that, "although the aggregate limit may apply separately per project, the total completed operations aggregate for all locations was still $5 million." Docket No. 549–17 at 4, ¶ 23; *see* Docket No. 549 at 12, SUMF 48. National Union issued a revised version of Endorsement 9 that was agreed to by the parties. The final version, as already noted, incorporates the "separately on a per project basis" language.

The Court finds the foregoing evidence regarding the inclusion of the phrase "separately on a per project basis" is "extrinsic evidence bearing upon the meaning of the written terms," *Cheyenne Mountain School Dist. No. 12*, 861 P.2d at 715, that may properly be used to "explain and give context to the language." *Lazy Dog Ranch*, 965 P.2d at 1236–37. It is therefore appropriately considered in interpreting Endorsement 9. Endorsement 9 reflects that the completed operations aggregate, like the ongoing operations aggregate, applies per project, not per location. The Court interprets the phrase "separately" to mean that, if a given location had multiple projects, the limit would apply to each project at the location. But as National Union emphasized throughout the discussions on the per project language, the per project language in the completed operations aggregate did not alter the $5 million aggregate for all projects. When this interpretation of Endorsement 9 is compared to the policy limits in the Schedule, which state that the "Per Project" limit for the completed operations aggregate is $5 million and that the "All Projects" completed op-

erations aggregate is also $5 million, the facial contradiction is resolved. In other words, Endorsement 9 and the Schedule do not conflict with one another.[11]

Given that the Court's interpretation of "separately on a per project basis" is consistent in all material respects with National Union's interpretation and with the resulting implications for the policy limits, National Union is entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that National Union Fire Insurance Company of Pittsburgh, PA.'s Motion to Supplement the Summary Judgment Record [Docket No. 698] is **DENIED**. It is further

**ORDERED** that National Union's Motion for Summary Judgment [Docket No. 549] is **GRANTED**. It is further

**ORDERED** that defendant Federal Insurance Company's Motion for Partial Summary Judgment Regarding National Union's Separate, Per Project, Completed Operations Coverage and Joinder in Intrawest's Motion for Partial Summary Judgment [Docket No. 556] is **DENIED**. It is further

**ORDERED** that Federal Insurance Company's Motion for Partial Summary Judgment Regarding National Union's Waiver of Objection to the Amounts Federal Paid to Settle the Mammoth Green and Eagle Run Claims [Docket No. 547] is **DENIED** as moot.[12] It is further

**ORDERED** that National Union Fire Insurance Company of Pittsburgh, PA.'s

11. Thus, the phrase "separately on a per project basis" is not the sea change that Federal claims it is, whose effect would be to convert a Program with a $5 million aggregate limit for completed operations coverage to one that, under Federal's interpretation, had a

$355 million aggregate limit. *See* Docket No. 549 at 37.

12. This motion is premised on Federal's interpretation of the Program, which the Court rejected in this Order.

Motion to Exclude Testimony and Strike Opinions of Federal Insurance Company's Retained Expert John Kezer [Docket No. 592] is **DENIED** as moot. It is further

**ORDERED** that National Union Fire Insurance Company of Pittsburgh, PA's Motion to Exclude Testimony and Strike Opinions of Federal Insurance Company's Retained Expert Thomas Ferrell [Docket No. 593] is **DENIED** as moot. It is further

**ORDERED** that defendant Federal Insurance Company's Motion to Strike the Testimony and Opinions of Matthew Watson under Fed. R. Evid. 702 and 703 [Docket No. 596] is **DENIED** as moot. It is further

**ORDERED** that National Union's Motion to Preclude Expert Testimony of Luis Rivera, or Alternatively to Compel a Second Deposition of Mr. Rivera and to Extend the Time to Move to Exclude his Testimony [Docket No. 597] is **DENIED** as moot. It is further

**ORDERED** that National Union's Objections to the Magistrate Judge's Recommendation Requiring Production of National Union's Settlement and Term Sheet [Docket No. 765] are **OVERRULED** as moot. It is further

**ORDERED** that National Union's Motion to Strike Federal's Designation of Michael Rodman's Testimony, or in the Alternative, Agreed Motion to Revive National Union's Motion to Exclude Mr. Rodman [Docket No. 774] is **DENIED** as moot. It is further

**ORDERED** that National Union's Motion for Protective Order Regarding Federal's Belated Discovery Request [Docket No. 784] is **DENIED** as moot. It is further

**ORDERED** that this case is closed.